## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **NATASHA PERRY, on behalf of herself and on behalf of all others similarly situated,** | **Case No. 1:25-cv-1783** |
| | **Judge Christopher A. Boyko** |
| Plaintiff, | **Magistrate Judge Jennifer Dowdell Armstrong** |
| v. | |
| **AMAZON.COM SERVICES LLC,** | **AMENDED CLASS ACTION AND COLLECTIVE ACTION COMPLAINT** |
| Defendant. | **JURY DEMAND ENDORSED HEREON** |

Plaintiff Natasha Perry ("Plaintiff"), on behalf of herself and all others similarly situated, submits this Amended Class Action and Collective Action Complaint against Defendant Amazon.com Services LLC ("Defendant or Amazon") and respectfully states as follows:

### INTRODUCTION

1.     This case is a class action and collective action lawsuit brought by Plaintiff, on behalf of herself and all others similarly situated (each defined below), to recover unpaid wages, penalties, and attorneys' fees and costs. This case challenges the policies and practices of Defendant that violate the Ohio Minimum Fair Wage Standards Act ("OMFWSA"), O.R.C. Chapter 4111, and the Ohio Prompt Pay Act ("OPPA"), O.R.C. § 4113.15. Plaintiff also brings this lawsuit under the common law of Ohio for Defendant's failure to pay Plaintiff and other similarly situated employees for all hours they worked in those weeks when they worked less than 40 hours.

2.     Plaintiff brings this case as a collective action pursuant to O.R.C. §§ 4111.03(D) and 4111.10(C) to remedy violations of Ohio law on behalf of herself and other similarly situated

employees of Defendant in Ohio and Plaintiff brings this case as a class action pursuant to Federal Rule of Civil Procedure 23 for the claims asserted under the OPPA and Ohio common law.

## JURISDICTION AND VENUE

3.      This Court has personal jurisdiction over Defendant because it has purposefully availed itself of the privileges of conducting activities in the state of Ohio and established minimum contacts sufficient to confer jurisdiction.  Defendant does business in Ohio, advertises in Ohio, employs workers in Ohio, and the violations of the law forming the basis of this lawsuit occurred in Ohio.  Therefore, the assumption of jurisdiction over Defendant will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process.  Defendant also had and continues to have continuous and systematic contacts with the State of Ohio sufficient to establish general jurisdiction over it.

4.      Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the acts or omissions giving rise the claims in this Complaint took place in this district.

## PARTIES

5.      Plaintiff is an adult individual residing in Chardon, Ohio (Geauga County).

6.      Plaintiff was employed by Defendant in Ohio as a non-exempt hourly employee. Plaintiff's written Consent to Join this Action was previously filed with the Court.

7.      At all relevant times, Plaintiff and other similarly situated persons were "employees" within the meaning of Ohio law.

8.      Defendant Amazon.com Services LLC is a Delaware limited liability company with its principal place of business in Washington State.

9.      At all relevant times, Defendant was registered with the Ohio Secretary of State to do business in Ohio and in fact, did do business in Ohio.

2

10.     At all relevant times, Defendant was an "employer" within the meaning of Ohio law.

11.     Defendant has been properly served and has made an appearance in this case.

## FACTS

12.      Defendant operates an international online retail shopping business that allows customers to order goods online and have those orders fulfilled and delivered through Defendant's expansive fulfillment network.

13.     Defendant's "fulfillment network is made up of state-of-the-art technology and a variety of building types and sizes to support processing orders, but it's truly [Amazon's] people who bring the magic of Amazon to life for our customers."[1]

14.     Defendant operates innumerable warehouses across the United States, and the world, to provide these services to its customers, including in Ohio.

15.     Each of these warehouses employs hundreds, and often thousands, of hourly paid workers.

16.     Some warehouses pick, pack, and ship orders for Amazon's customers, while others sort already packed customer orders for faster delivery to final destinations.

17.     Plaintiff was employed by Defendant at its "CLE2" North Randall, Ohio warehouse from approximately November 2018 until January 2024. CLE2 is an Amazon fulfillment center.

18.     Indeed, Plaintiff worked for Defendant as an hourly, non-exempt employee. She was employed as a fulfillment center associate. Defendant agreed to pay her for all hours she worked for Defendant at a set hourly rate. Her regular job duties included moving boxes, stacking packages, and loading packages. In one or more individual workweeks during her employment,

---

[1] https://www.aboutamazon.com/workplace/facilities (last viewed 7/21/25).

Plaintiff worked 40 or more hours. Plaintiff worked with hundreds of other Amazon workers at the CLE2 fulfillment center in Ohio.

19.     Defendant maintained a policy and practice whereby its hourly employees, including Plaintiff and other similarly situated employees, were required to complete a security screening each day off the clock and without pay.

20.     The security screening took place after Plaintiff and other similarly situated employees clocked out. After clocking out, Plaintiff and other similarly situated employees were required to walk from their workstation down a designated path towards a security screening station.  Plaintiff and other similarly situated employees were required to walk down the path and could not deviate to another location or bypass the security screening.

21.     At the security screening station, Plaintiff and other similarly situated employees were required to stand in a line and then were called one by one to be screened. The security screening involved placing bags and belongings on a conveyor belt and then walking through a metal detector.

22.     After the first security screening was completed, Amazon selected individuals at random to undergo a secondary security screening. The secondary security screening occurred each day and up to 5% of Amazon employees were selected at random each day to complete the secondary security screening.  Plaintiff and other similarly situated employees were selected by Amazon and were required by Amazon to complete the secondary security screening.

23.     Upon being selected, Plaintiff and other similarly situated employees were required to immediately report to the secondary screening station.

24.     The secondary screening was a more thorough screening that occurred after completion of the first screening.

25.     During the secondary screening, Plaintiff and other similarly situated employees were required to remove their shoes, remove their belt, remove their jacket, empty their pockets, empty their bags and submit themselves and any personal belongings in their possession for inspection.

26.     Plaintiff and other similarly situated employees would then have to walk through a metal detector again and undergo a further search if any metal objects were detected.

27.     After clearing the metal detector, Plaintiff and other similarly situated employees would then gather their belongings and put on their shoes, belts, and jackets, and otherwise collect themselves after undergoing this screening.

28.     Amazon has data showing the date and time when the secondary screening occurred for each Plaintiff and other similarly situated employee.

29.     Indeed, Amazon has data that identifies the precise time when its employees, including Plaintiff and other similarly situated employees, clocked out.

30.     Amazon also has data that identifies the time when the secondary screening begins for each of its employees, including Plaintiff and other similarly situated employees.

31.     Further, Amazon has data that identifies the time when the secondary screening ends for each of its employees, including Plaintiff and other similarly situated employees.

32.     As such, there is no dispute as to the amount of time Plaintiff and other similarly situated employees spent off the clock as a result of the screenings.

33.     This amount of time is undisputed and identifiable clearly from Amazon's own records.

34.     Amazon's records identify for each Plaintiff and other similarly situated employee how much time they spent off the clock as a result of the screenings each day and each week.

35.     Amazon records this information for its own data management purposes, for its anti-theft goals, and for its supply management objectives.  There is no dispute about this time spent by Plaintiff and other similarly situated employees.

36.     The time it took Plaintiff and other similarly situated employees to go through the screening process when they were selected for the secondary screening lasted anywhere between 10 to 15 minutes or longer depending on the number of people who had to be screened.

37.     Given that the screenings occurred after the Plaintiff and other similarly situated employees had clocked out, Plaintiff and other similarly situated employees were not compensated for the time spent undergoing the screenings.

38.     These screenings were required by Defendant, controlled by Defendant, completed at the specific direction of Defendant, and undertaken on Defendant's premises primarily for the benefit of Defendant.

39.     Additionally, during the screenings, Plaintiff and other similarly situated employees were subject to the control of Defendant, were required to follow all of Defendant's instructions while waiting for and during the security screenings, were confined to Defendant's premises, and were required to comply under threat of discipline, including possible termination.

40.     Further, Defendant compelled its employees to perform specific tasks during the screenings, such as waiting in line, emptying their pockets, submitting their bags or belongings for a search, and walking through a metal detector.

41.     Plaintiff and other similarly situated employees underwent this screening process during the regular workday and during prescribed hours, and at the specific direction of Defendant and/or pursuant to an express provision of a written or unwritten contract. Therefore, the exemptions under Ohio R.C. 4111.031 do not apply, and the screenings constitute compensable

6

time worked under Ohio law. *See* O. R.C. 4111.031(B)(2) and (C)(1).  Section 4111.031 became effective July 6, 2022.

42.     Section 4111.031 was amended on July 6, 2022 to provide greater protections to workers in Ohio, like Plaintiff and other similarly situated employees.

43.     The intention of the Ohio Legislature was to require employers in Ohio, like Defendant, to provide compensation to its employees for certain pre-shift and post-activities, including the screenings at issue in this case.

44.     Given the actions of Defendant, Plaintiff and other similarly situated employees were not paid for all hours worked and not paid overtime compensation for all hours they worked in excess of 40 each workweek.

45.     Defendant knowingly violated Ohio law by engaging in the above-mentioned violations.

## CONTINUOUS WORKDAY RULE

46.     After clocking out, the Plaintiff and other similarly situated employees were required to walk to the security screening checkpoint. After arriving at the security screening station, the Plaintiff and other similarly situated employees underwent the screenings described in this Complaint.

47.     Pursuant to the continuous workday rule, once the first compensable activity is performed, the continuous workday has started, and all subsequent activities performed are compensable regardless of the amount of time each specific individual activity takes. *See* 29 C.F.R. § 790.6(a). The continuous workday rule requires compensation from the start of the first compensable activity to the last compensable activity. *See id*. Specifically, section 790.6(a) states as follows:

> Periods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked to the same extent as would be required if the Portal Act had not been enacted.

*Id*.

48.     Thus, pursuant to the continuous workday rule, Plaintiff and other similarly situated employees are entitled to compensation from the time they clocked out to the time they completed the secondary security screening.

49.     Due to the substantial post-shift work, Plaintiff and other similarly situated employees were not paid for all time worked each day and are owed significant unpaid wages.

50.     Although Amazon employs electronic clocking-in technology, this technology was not made accessible to Plaintiff or other similarly situated employees after the screenings were completed.

## **OHIO COLLECTIVE ACTION ALLEGATIONS**

51.     Plaintiff brings this action pursuant to O.R.C. § 4111.10(C) on behalf of herself and a class of persons employed by Defendant in Ohio within the last two years ("Collective Members") defined as:

> **All current and former hourly employees employed by Defendant at its Ohio locations who were required to undergo a secondary security screening at any time from March 18, 2023, through final disposition of this matter.**

52.     Such persons are "similarly situated" with respect to Defendant's Ohio overtime violations in that all were non-exempt hourly employees and all were subjected to and injured by Defendant's unlawful practice described herein. All have the same claims against Defendant for unpaid overtime compensation as well as for attorneys' fees and costs

53.     Notice of this case as a collective action pursuant to O.R.C. § 4111.10(C) is proper and necessary so that such persons may be sent a Court-authorized notice informing them of the pendency of this action and giving them the opportunity to "opt in."

54.     The persons similarly situated to Plaintiff are readily identifiable through the payroll records Defendant has maintained, and were required to maintain, pursuant to Ohio law. The number and identity of the Collective Members are determinable from Defendant's records. The hours assigned and worked, the positions held, and the rates of pay for each Collective Member are also determinable from Defendant's records. For the purpose of notice and other purposes related to this action, their names and addresses are readily available from Defendant.

55.     All of the Collective Members experienced the same or similar working conditions and were subject to the same corporate practices and policies of Defendant, as alleged herein, that failed to pay Collective Members for all compensable time spent on the job site.

56.     Plaintiff and the Collective Members have all sustained similar types of damages as a result of Defendant's failure to comply with Ohio law.

57.     Plaintiff and the Collective Members have all been injured in that they have been under-compensated due to Defendant's common policies, practices, and patterns of conduct. Defendant's corporate-wide policies and practices affected all Collective Members similarly, and Defendant benefited from the same type of unfair and/or wrongful acts inflicted upon each of the Collective Members.

58.     Plaintiff and the Collective Members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures.

59.     Collective action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

60.     Because the losses, injuries, and damages suffered by each of the individual Collective Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Collective Members to redress the wrongs done to them.

61.     On the other hand, important public interests will be served by addressing this matter as a collective action.

62.     The adjudication of individual claims would result in a great expenditure for the Court and to public resources; however, allowing a collective action would result in a significant saving of costs.

63.     The issues in this action can be decided by means of common, collective-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action.

## **CLASS ACTION ALLEGATIONS**

64.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following Classes ("Classes"), which are comprised of:

> **Breach of Contract: All current and former hourly paid employees of Amazon in Ohio who completed a secondary security screening and who worked less than 40 hours for at least one week from July 6, 2022 to final resolution of this Action.**

> **Quantum Meruit: All current and former hourly paid employees of Amazon in Ohio who completed a secondary security screening and who worked less than 40 hours for at**

**least one week from July 6, 2022 to final resolution of this Action.**

**Unjust Enrichment:  All current and former hourly paid employees of Amazon in Ohio who completed a secondary security screening and who worked less than 40 hours for at least one week from July 6, 2022 to final resolution of this Action.**

**OPPA: All current and former hourly paid employees of Amazon in Ohio who worked who completed a secondary security screening during at least one week from July 6, 2022 to final resolution of this Action.**

65. <u>Numerosity</u>: The number of members in each of the Classes is believed to exceed 40 and in fact, is likely to be in the thousands. This volume makes bringing the claims of each individual member of the Classes before this Court impracticable. Likewise, joining each individual member of the Classes as a Plaintiff in this action is impracticable. Furthermore, the identities of the members of the Classes will be determined from Amazon's records, as will the compensation paid to each of them. As such, a class action is a reasonable and practical means of resolving these claims. To require individual actions would prejudice the Class Members and Amazon.

66. <u>Typicality</u>: Plaintiff's claims are typical of the Class Members' claims because like the members of the Classes, Plaintiff was subject to Amazon's uniform policies and practices and was compensated in the same manner as others in the Classes. Amazon failed to pay the Class Members for all hours they worked, like Plaintiff. As such, Plaintiff's claims are typical of the claims of the Class Members. Plaintiff and all members of the Classes sustained damages arising out of and caused by Amazon's common course of conduct as alleged herein.

67. <u>Adequacy</u>: Plaintiff is a representative party who will fairly and adequately protect the interests of the Class Members because it is in Plaintiff's interests to effectively prosecute the

claims asserted herein in order to obtain the unpaid wages and penalties required under Ohio law. Plaintiff has retained attorneys who are competent in both class actions and wage-and-hour litigation. Plaintiff does not have any interest which may be contrary to or in conflict with the claims of the Class Members she seeks to represent.

68.     Commonality: Common issues of fact and law predominate over any individual questions in this matter. The common issues of fact and law include, but are not limited to:

      a.  Whether Plaintiff and the Class Members are entitled to compensation for the time spent in the screenings;

      b.  Whether Amazon failed to pay Plaintiff and the Class Members wages for all hours worked in those weeks when they worked less than 40 hours; and,

      c.  The proper measure of damages sustained by Plaintiff and the Class Members.

69.     Superiority: A class action is superior to other available means for the fair and efficient adjudication of this lawsuit. Even in the event any member of the Classes could afford to pursue individual litigation against a company the size of Amazon, doing so would unduly burden the court system. Individual litigation would magnify the delay and expense to all parties and flood the court system with duplicative lawsuits. Prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying judicial results and establish incompatible standards of conduct for Amazon.

70.     A class action, by contrast, presents far fewer management difficulties and affords the benefits of uniform adjudication of the claims, financial economy for the parties, and comprehensive supervision by a single court. By concentrating this litigation in one forum, judicial economy and parity among the claims of individual Class Members are promoted. Additionally, class treatment in this matter will provide for judicial consistency. Notice of the pendency of this

lawsuit and any resolution of this action can be provided to the Class Members by mail, electronic mail, text message, print, broadcast, internet and/or multimedia publication. The identity of the members of the Classes is readily identifiable from Amazon's records.

71.     This type of case is well-suited for class action treatment because: (1) Amazon's practices, policies, and/or procedures were uniform; (2) the burden is on Amazon to prove it properly compensated its employees; and (3) the burden is on Amazon to accurately record hours worked by its employees. Ultimately, a class action is a superior method to resolve the Ohio claims detailed herein because of the common nucleus of operative facts centered on the failure of Amazon to pay Plaintiff and the Class Members in compliance with Ohio law.

## COUNT ONE: OVERTIME VIOLATIONS

72.     Plaintiff realleges and incorporates all allegations contained in the foregoing paragraphs.

73.     Plaintiff brings this claim for violation of the OMFWSA, on behalf of herself and all Collective Members pursuant to O.R.C. §4111.10(C).

74.     At all relevant times, Plaintiff and the Collective Members regularly worked 40 or more hours per workweek for Defendant.

75.     Defendant violated the OMFWSA by failing to pay Plaintiff and the Collective Members for all overtime compensation due to them as required by the OMFWSA.

76.     Defendant violated the OMFWSA by requiring Plaintiff and the Collective Members to perform work off the clock; namely, completing security screenings off the clock, including the time spent walking to the screening station, waiting in line for the screenings, and completing the screenings.

77.     Defendant's conduct injured Plaintiff and the Collective Members in that they did not receive the overtime compensation due to them pursuant to the OMFWSA.

78.     Ohio Rev. Code Ann. § 4111.10(A) provides that Defendant, having violated §4111.03, is "liable to the employee[s] affected for the full amount of the overtime wage rate, less any amount actually paid to the employee[s] by the employer, and for costs and reasonable attorney's fees as may be allowed by the court."

## COUNT TWO: BREACH OF CONTRACT

79.     Plaintiff realleges and incorporates all allegations contained in the foregoing paragraphs.

80.     Plaintiff brings this claim for compensation for shifts in which she completed a secondary security screening in weeks when she worked less than 40 hours.

81.     A valid and enforceable agreement existed between Plaintiff and Amazon and between the Breach of Contract Class Members and Amazon, the terms and conditions of which include, but are not limited to, an agreement by Plaintiff and the Breach of Contract Class Members to perform services for Amazon and for Amazon to pay Plaintiff and the Breach of Contract Class Members for the hours they worked during their employment with Amazon at an agreed hourly rate.

82.     The contract was an oral offer made at the time of hire.  The contract was then documented into an offer letter.  The terms of the agreement were straightforward.  Plaintiff agreed to be employed by Amazon and to perform work for Amazon in exchange for Amazon's payment of an hourly rate for the hours worked by Plaintiff for Amazon.  That is, Amazon made an offer to Plaintiff to pay Plaintiff an hourly rate all time spent working for Amazon while employed by

Amazon.  Plaintiff accepted that offer and began performing work for Amazon. Amazon accepted the benefits of the work performed by Plaintiff.

83.     Amazon sent a written letter to Plaintiff which documented the offer made by Amazon to employ Plaintiff and to pay Plaintiff an agreed upon hourly rate for all hours worked by Plaintiff for Amazon during her employment with Amazon.  Plaintiff accepted the offer.  The agreement provided that, in exchange for her work as a Fulfillment Associate at the CLE2 fulfillment center, Plaintiff would receive $15.00 per hour worked during her employment with Amazon.

84.     Work that must be paid by an employer under Ohio law includes all time spent by the employee working "during the regular work day or during prescribed hours" and all time spent performing any "activity at the specific direction of the employer."

85.     Under Ohio law and pursuant to a mutual understanding between Plaintiff and Amazon, the agreement's payment terms both expressly and impliedly incorporated an obligation to compensate Plaintiff for all work performed by Plaintiff during the regular workday, during prescribed hours, at the specific direction of Amazon, and/or pursuant to an express provision of the written or unwritten contract.

86.     Amazon specifically directed and required Plaintiff to undergo secondary security screenings during prescribed hours at Amazon's CLE2 fulfillment center, under threat of discipline for noncompliance and primarily for Amazon's operational benefit.

87.     Amazon accepted the benefit of this work performed by Plaintiff.

88.     However, Amazon violated the agreement by failing to pay Plaintiff for the time spent completing the secondary screenings, including the time spent walking to the screening station, waiting in line for the screenings, and completing the screenings.

15

89. Amazon should have compensated Plaintiff for these screenings because the screenings were completed by Plaintiff during the regular workday, during prescribed hours, at the specific direction of Amazon, and/or pursuant to a provision of a written or unwritten contract.

90. The agreement reached between Plaintiff and Amazon included Amazon paying Plaintiff for this time and for this work.

91. Plaintiff suffered damages as a result of Amazon's breach of the agreement. Plaintiff was not paid for all time worked in those weeks when she worked less than 40 hours. Consequently, she was denied monetary compensation due under the law.

92. The same facts exist for the Breach of Contract Class Members.

93. Plaintiff and the Breach of Contract Class Members duly performed under the agreement at Amazon's direction and for its benefit, as noted herein.

94. Amazon failed and refused to fulfill its obligations under the oral and written agreement by not paying for this time worked by Plaintiff and the Breach of Contract Class Members, including the time spent in the screenings.

95. Plaintiff and the Breach of Contract Class Members are entitled to recover damages from these breaches from July 6, 2022.

## COUNT THREE: QUANTUM MERUIT

96. Plaintiff realleges and incorporates all allegations contained in the foregoing paragraphs.

97. Plaintiff brings this claim for compensation for shifts in which she completed a secondary security screening in weeks when she worked less than 40 hours.

98.     This claim is pled in the alternative to Count Two. Plaintiff and the Quantum Meruit Class Members performed and provided valuable work (as described in this Complaint) to Amazon during their employment with Amazon.

99.     No enforceable contract governing compensation for the screening time exists between Plaintiff and Amazon or between the Quantum Meruit Class Members and Amazon.

100.    The screenings constitute compensable work that was primarily for the benefit of Amazon, performed during the workday, performed during prescribed hours, was required by Amazon, and performed at the specific direction of Amazon.

101.    Amazon bears the risk of loss for items purchased by Amazon customers and for any other inventory and supply-chain components that are stolen, taken, or otherwise misplaced by Amazon employees.  Such risks are operational burdens to Amazon.  These risks increase the costs to Amazon and cause Amazon to lose profits.

102.    By requiring Plaintiff and the Quantum Meruit Class Members to submit to the screenings, Amazon externalized the costs of its risk-prevention measures onto Plaintiff and the Quantum Meruit Class Members.  Indeed, by requiring the screenings, Amazon passed on its operational costs to Plaintiff and the Quantum Meruit Class Members.

103.    In submitting to the screenings, Plaintiff and the Quantum Meruit Class Members conferred substantial operational and financial benefits to Amazon, including protecting customer orders, reducing inventory shortage, preventing lost or misplaced items, and maintaining supply-chain integrity, in furtherance of Amazon's own loss-prevention goals.  To Amazon, loss prevention is a top priority.  Amazon's website states that a goal is to foster "a safe, secure, and resilient end-to-end supply chain that our associates and customers value and trust."

(https://www.amazon.jobs/content/en/teams/fulfillment-and-operations/security-loss-prevention, last visited 11/17/2025).

104. Amazon further states that it strives "to be an efficient ecosystem of experts, analytics, and technologies that reduce security disruptions to ensure Amazon delivers on its customer promise." (*Id*.)

105. By requiring Plaintiff and the Quantum Meruit Class Members to complete the screenings, Amazon was able to reduce theft and inventory shortage. By reducing theft and inventory shortage, Amazon was able to fulfill its customers' orders and fulfill these orders faster and more efficiently. This increased the sales of Amazon and enabled Amazon to earn billions of dollars in profits. Thus, the screenings enabled Amazon to increase its sales while reducing its costs. This provides a substantial and significant benefit to Amazon. These benefits include billions in profits, increased goodwill with customers, reputational benefits, repeat customer orders, and other benefits.

106. Amazon had knowledge of, accepted, appreciated, and retained the operational benefits of Plaintiff's and the Quantum Meruit Class Member's efforts. Indeed, Amazon requires the screenings and Plaintiff and the Quantum Meruit Class Members were not permitted to leave Amazon's premises without completing the screenings.

107. Amazon had reasonable notice and/or knowledge that Plaintiff and the Quantum Meruit Class Members expected to be compensated for the time spent walking to the screening station, waiting in line for the screenings, and completing the screenings. Indeed, Plaintiff and the Quantum Meruit Class Members expected to be paid for all time they spent working for Amazon.

108. Amazon failed to pay Plaintiff and the Quantum Meruit Class Members the reasonable value of their work.

109. Under the circumstances described in this Complaint, it would be inequitable for Amazon to retain the benefit of this work without payment of value to the Plaintiff and Quantum Meruit Class Members.

110. Plaintiff and the Quantum Meruit Class Members are entitled to recover damages under this claim since July 6, 2022.

### COUNT FOUR: UNJUST ENRICHMENT

111. Plaintiff realleges and incorporates all allegations contained in the foregoing paragraphs.

112. Plaintiff brings this claim for compensation for shifts in which she completed a secondary security screening in weeks when she worked less than 40 hours.

113. This claim is pled in the alternative to Count Two. Plaintiff and the Unjust Enrichment Class Members performed and provided valuable work (described in this Complaint) to Amazon during their employment with Amazon.

114. Plaintiff and the Unjust Enrichment Class Members conferred direct and substantial benefits on Amazon by submitting to the security screenings. Such benefits include protecting customer orders, reducing inventory shortage, preventing lost or misplaced items, and maintaining supply-chain integrity, in furtherance of Amazon's own loss-prevention goals.

115. Amazon bears the risk of loss for items purchased by Amazon customers and for any other inventory and supply-chain components that are stolen, taken, or otherwise misplaced by Amazon employees. Such risks are operational burdens to Amazon. These risks increase the costs to Amazon and cause Amazon to lose profits.

116. By requiring Plaintiff and the Quantum Meruit Class Members to submit to the screenings, Amazon externalized the costs of its risk-prevention measures onto Plaintiff and the

Quantum Meruit Class Members.  Indeed, by requiring the screenings, Amazon passed on its operational costs to Plaintiff and the Quantum Meruit Class Members.

117.    In doing so, Plaintiff and the Quantum Meruit Class Members conferred substantial operational and financial benefits to Amazon, including protecting customer orders, reducing inventory shrinkage, and maintaining supply-chain integrity, in furtherance of Amazon's own loss-prevention goals.  Amazon makes loss prevention a top priority.  Amazon's website states that a goal is to foster "a safe, secure, and resilient end-to-end supply chain that our associates and customers value and trust."

(https://www.amazon.jobs/content/en/teams/fulfillment-and-operations/security-loss-prevention, last visited 11/17/2025).

118.    Amazon further states that it strives "to be an efficient ecosystem of experts, analytics, and technologies that reduce security disruptions to ensure Amazon delivers on its customer promise." (*Id.*)

119.    By requiring Plaintiff and the Quantum Meruit Class Members to complete the screenings, Amazon was able to reduce theft and inventory shortage.  By reducing theft and inventory shortage, Amazon was able to fulfill its customers' orders and fulfill these orders faster and more efficiently.  This increased the sales of Amazon and enabled Amazon to earn billions of dollars in profits.  Thus, the screenings enabled Amazon to increase its sales while reducing its costs.  This provides a substantial and significant benefit to Amazon.  These benefits include billions in profits, increased goodwill with customers, reputational benefits, repeat customer orders, and other benefits.

120.    Amazon required the screenings, had knowledge of the screenings, and was aware of the operational and financial benefits provided by Plaintiff's and the Unjust Enrichment Class Member's efforts.

121.    The screenings constitute compensable work that was primarily for the benefit of Amazon, performed at the direction of Amazon, performed during the workday, required by Amazon, and performed during prescribed hours.

122.    Under these circumstances, it would be unfair and inequitable for Amazon to retain the benefit of the services and work performed by Plaintiff and the Unjust Enrichment Class Members without compensating them.

123.    Plaintiff and the Unjust Enrichment Class Members are entitled to recover damages under this claim from July 6, 2022.

## COUNT FIVE: OPPA

124.    Plaintiff realleges and incorporates all allegations contained in the foregoing paragraphs.

125.    Plaintiff brings this claim for violation of the OPPA on behalf of herself and the OPPA Class Members for which certification is sought pursuant to Fed. R. Civ. P. 23.

126.    Plaintiff seeks compensation for those shifts in which she completed a secondary security screening.

127.    At all times relevant to this Complaint, Defendant employed Plaintiff and the OPPA Class Members within the meaning of the OPPA and was subject to its compliance.

128.    R.C. 4113.15(A) requires that Defendants pay Plaintiff and the Class Members all wages on or before the first day of each month, for wages earned during the first half of the

preceding month ending with the fifteenth day thereof, and on or before the fifteenth day of each month, for wages earned during the last half of the preceding calendar month.

129.    There is no dispute that Defendant has an obligation to pay employees for all hours worked. However, Defendants did not pay Plaintiff and the OPPS Class Members for the time spent walking to the screening station, waiting in line for the screenings, and completing the screenings.

130.    Plaintiff and the OPPA Class Members' unpaid wages have remained unpaid for more than 30 days beyond their regularly scheduled payday in violation of R.C. 4113.15(A).

131.    Plaintiff and the OPPA Class Members are entitled to unpaid wages and liquidated damages pursuant to R.C. 4113.15(A).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and all persons similarly situated, prays that this Honorable Court:

A.    Authorize notice pursuant to O.R.C. § 4111.10(C) on behalf of Plaintiff and the Collective Members;

B.    Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the members of each of the Classes;

C.    Enter judgment against Defendant and in favor of Plaintiff, the Collective Members and the members of each of the Classes;

D.    Award Plaintiff and the Collective Members damages for unpaid overtime wages;

E.    Award Plaintiff and the members of each of the Classes unpaid straight time wages in those weeks when they worked less than 40 hours;

F.    Award Plaintiff and the OPPA Class Members liquidated damages in an amount equal to six per cent (6%) of the amount of the unpaid wages still unpaid or two hundred dollars per OPPA Class Member, whichever is greater;

G.    Award Plaintiff, the Collective Members and the members of each of the Classes pre-judgment and post-judgment interest at the statutory rate;

H. Award Plaintiff, the Collective Members, and the members of each of the Classes all attorneys' fees, costs, and disbursements incurred in prosecuting this action; and

I. Award Plaintiff, the Collective Members, and the members of each of the Classes any such further and additional relief as this Court deems just and proper.

Respectfully submitted,

**NILGES DRAHER LLC**

*/s/ Hans A. Nilges*
Hans A. Nilges (0076017)
7034 Braucher Street, N.W., Suite B
North Canton, OH 44720
Telephone: (330) 470-4428
Facsimile: (330) 754-1430
Email:  hans@ohlaborlaw.com

Robi J. Baishnab (0086195)
1360 E. 9th St., Ste. 808
Cleveland, OH 44114
Telephone: (216) 230-2955
Facsimile: (330) 754-1430
Email: rbaishnab@ohlaborlaw.com

AND

**FOTY LAW GROUP**

*/s/ Don J. Foty*
Don J. Foty
Texas Bar No. 24050022
Foty Law Group
2 Greenway Plaza, Suite 250
Houston, TX 77046
Telephone: (713) 523-0001
Email: dfoty@fotylawgroup.com

*Counsel for Plaintiff*

<u>**JURY DEMAND**</u>

Plaintiff hereby demands a trial by jury on all claims so triable.

*/s/ Don J. Foty*
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the Court's electronic case file system on November 17, 2025, which will provide a copy to all counsel of record.

*/s/ Don J. Foty*_____
*Counsel for Plaintiff*
